IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PETER SALVADOR MEDINA, ) | |
| ) | Case No.  1:08-CV-456-BLW |
| Plaintiff, ) | |
| ) | **ORDER** |
| vs. ) | |
| ) | |
| PHILLIP VALDEZ, CORRECTIONS, ) | |
| CORPORATION OF AMERICA, ) | |
| IDOC, and IDAHO PAROLE BOARD, ) | |
| ) | |
| Defendants. ) | |
| ——————————————— ) | |

Pending before the Court are Plaintiff's Motion for a Temporary or Preliminary

Injunction and Plaintiff's Motion for Pretrial Conference.  (Docket Nos. 14 & 19.) Having

reviewed the record in this matter, and having considered the arguments of the parties, the

Court has determined that oral argument is not necessary, and thus enters the following

Order denying the motions.

## MOTION FOR PRELIMINARY INJUNCTION

**A.    Background**

In his Complaint, Plaintiff alleges that Defendants violated his rights under the

Americans with Disabilities Act,[1] when they failed to make an accommodation for his

mental illness condition in the Therapeutic Community (TC) Program, preventing him

---

[1]Americans with Disabilities Act of 1990, § 1, *et seq*, as amended, 42 U.S.C. §12101, *et seq*. (Title I), § 12132, *et seq*. (Title II), §12181, *et seq*. (Title III).

**ORDER  1**

from completing the program, and which, as a result, caused him to become ineligible for parole.  Plaintiff  alleges that the TC program at the Idaho Correctional Center (ICC), as currently implemented, is harmful to inmates who suffer from post-traumatic stress disorder (PSTD) and bipolar disorder, and that the prison offers no alternative rehabilitative program for mentally ill inmates; therefore, mentally ill inmates are deprived of an equal opportunity for rehabilitation and for meeting the programming requirement to become eligible for parole.  In his Motion for Temporary Injunction, Plaintiff asks that the Court enter an order preventing Defendants from placing him or other inmates with the same disorders[2] in housing wings where the programs have not been corrected or adjusted for his disability – PTSD and bipolar disorder.  He also asks that Defendants be penalized $250 per day if they place an inmate with PTSD or bipolar disorder in the current programs wing at ICC without having modified the program to accommodate such disabilities.

In response, Defendants Philip Valdez (Warden of ICC) and Correctional Corporation of America (CCA, which is the owner and operator of ICC), have provided the Affidavit of Charles Fletcher, who has been employed as the Mental Health

---

[2] *See Steger v. Franco, Inc*., 228 F.3d 889, 894 (8th Cir. 2000) ("our analysis of Article III standing, informed by the ADA's language and policy, leads us to conclude that Burch has standing to seek relief for any ADA violations in the CCB affecting his specific disability"). Here, the Court liberally construes Plaintiff's claims made on behalf of others as claims that Defendants should be required to correct conditions that affect anyone with his specific disability; however, Plaintiff is not an attorney and cannot otherwise make claims on behalf of others.

**ORDER  2**

Coordinator at ICC for approximately four years.[3]  (Docket No. 18.)  Fletcher states that

he is familiar with Plaintiff and Plaintiff's allegations regarding availability of mental

health treatment at ICC.  Fletcher declares that once a determination has been made that

an inmate needs mental health services, a "Qualified Mental Health Provider" (QMHP)

develops an overall treatment plan for the inmate, which includes treatment  with

medication, therapy, and follow-up care.  Inmates are given the same type of mental

health treatment whether they are within or without the TC program.

       Before inmates can enter the TC program, they are evaluated to determine whether

they are suitable for the program.  Inmates with a mental health diagnosis have an

additional separate, individualized analysis performed to determine whether they are

suitable for the program.  Inmates with mental health issues will be admitted to the TC

program if they meet the following criteria: (1) no current risk of suicide; (2) no current

self-mutilating behavior; (3) not actively psychotic; (4) have been stable on medication

for three months; (5) have demonstrated an ability to participate in group work; and (6)

are in compliance with hygiene and grooming standards.  (*Id.*, ¶¶ 1-10; Exhibit C, p. 9

(internal p. 8), Docket No. 18-4.)

       Plaintiff was enrolled in the TC program from June 25, 2007, to July 20, 2007.  He

did not have a mental health diagnosis prior to entering the TC program.  Once in the

---

[3]  Plaintiff argues that Charles Fletcher is not licensed to make mental health evaluations. However, it is clear from Plaintiff's medical records that a licensed psychiatrist or psychologist monitors Plaintiff's mental health treatment.

**ORDER  3**

program, he was treated individually by a mental health professional on six different

occasions and issued several prescription medications.  Although he did not remain in the

program, he has been continuously treated for his mental health conditions during his

incarceration at ICC.  (*Id*., ¶¶ 11-49; Exhibit D, Docket Nos. 18-5 7 18-6.)

By letter, Olivia Craven, the executive director of the Idaho Commission of

Pardons and Parole, explained Plaintiff's circumstances:

> As the commission explained to Mr. Medina at the hearing, they
> look at the whole picture of a person, not just certain events or certain parts.
> He has a serious criminal history and substance abuse history, as you are
> aware.  He has violated both paroles he was released on, and with serious
> violations.  The assessments show that he needs the TC programming.  The
> Assessments show that he has a 90% chance of re-offending without the
> long-term program to reduce that risk.  This is all based on valid research.
> The TC program is not a punishment, but has been ordered to give Mr.
> Medina the tools for use for the rest of his life.  The job is first to consider
> the safety of the public, then the rehabilitation of the offender.

(Exhibits to Plaintiff's Reply, June 28, 2007 Letter from Olivia Craven re: Peter Medina,
p. 15 (internal p. 2) Docket No. 22.)

Plaintiff alleges that his participation in the TC program has never been evaluated

with regard to Plaintiff's disability.  While that may have been true as of the date he filed

his Motion for Temporary Injunction, the attachments to his Reply show that an

evaluation took place recently.  On April 13, 2009, Plaintiff received correspondence

from the IDOC stating that the chief psychologist, Dr. Craig, was reviewing his file for

parole/TC program purposes, and that after Dr. Craig completed his review, Chief Deputy

Shane Evans would complete a review.  (Exhibits to Plaintiff's Reply, April 13, 2009

Letter to Peter Medina from Renae L.P. James, p. 20 (Docket No. 22.)  On April 23,

**ORDER  4**

2009, Deputy Evans wrote a letter to Plaintiff stating that he "will recommend to the Parole Commission that he be allowed to complete an alternative case plan."  (*Id.*, April 23, 2009 Letter to Peter Medina from Shane L. Evans, p. 21.)  On July 16, 2009, the ICPP reviewed Petitioner's case and entered the following case status note: "Reviewed information not reviewed in June regarding his ineligibility for TC.  Commission wants hearing to discuss alternative plan."[4]

### B.    Standard of Law

Plaintiff brings his motion pursuant to Federal Rule of Civil Procedure 65.  A Rule 65 preliminary injunction may be granted if the moving party demonstrates the following elements: (1) that the moving party will suffer irreparable injury if the relief is denied; (2) that the moving party will probably prevail on the merits; (3) that the balance of potential harm favors the moving party; and (4) that the public interest favors granting relief. *Winter v. Natural Resources Defense Council, Inc*., – U.S. –, 129 S.Ct. 365, 374 (2008); *Cassim v. Bowen*, 824 F.2d 791, 795 (9th Cir. 1987).  "Because a preliminary injunction is an extraordinary remedy, the movant's right to relief must be clear and unequivocal." *Dominion Video Satellite v. Echostar Satellite Corp*., 269 F.3d 1149, 1154 (10th Cir. 2001); *see also Stanley v. Univ. of Southern California*, 13 F.3d 1313 (9th Cir. 1994) (relief must be denied unless the facts and law clearly favor the moving party).

The purpose of a preliminary injunction is to preserve the status quo if the balance

---

[4]  See ICPP website at www2.state.id.us/parole.

**ORDER  5**

of equities so heavily favors the moving party that justice requires the court to intervene to secure the positions until the merits of the action are ultimately determined. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Where, as here, a party seeks a mandatory preliminary injunction, the court must deny such relief "unless the facts and law clearly favor the moving party." *See Stanley v. University of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (quotation and citation omitted). In deciding whether to issue a preliminary injunction, the court "is not bound to decide doubtful and difficult questions of law or disputed questions of fact." *Internat'l. Molders' and Allied Workers' Local Union No. 164 v. Nelson*, 799 F.2d 547, 551 (9th Cir. 1986) (citing *Dymo Industries, Inc. v. Tapewriter, Inc*., 326 F.2d 141, 143 (9th Cir. 1964)). A court "is not obligated to hold a hearing [on a motion for a preliminary injunction] when the movant has not presented a colorable factual basis to support the claim on the merits or the contention of irreparable harm." *Bradley v. Pittsburgh Board of Education,* 910 F.2d 1172, 1176 (3rd Cir. 1990).

The Prison Litigation Reform Act, 18 U.S.C. § 3626 (PLRA) requires that prospective injunctive relief against a state prison system be "narrowly drawn, extend[ ] no further than necessary to correct the violation of the Federal right, and [be] the least intrusive means necessary to correct the violation of the Federal right." *Id*. at § 3626(a)(1); *Armstrong v. Davis*, 275 F.3d 849, 872 (9th Cir. 2001); *Gomez v. Vernon*, 255 F.3d 1118, 1129 (9th Cir. 2001) (PLRA "has not substantially changed the threshold findings and standards required to justify an injunction.").

**ORDER  6**

Title II of the Americans with Disabilities Act (ADA)[5] provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  A "disability" is defined by the ADA as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A). The regulations implementing the ADA define "mental impairment" as "[a]ny mental or psychological disorder such as ... organic brain syndrome, emotional or mental illness, and specific learning disabilities."  28 C.F.R. § 35.104.

The Supreme Court has held that the ADA prohibits state prisons from discriminating against inmates on account of their disabilities.  *Pennsylvania Dep't. of Corrections v. Yeskey*, 524 U.S. 206, 209-10 (1998).  "[P]risons provide inmates with many recreational activities, . . . services, and educational and vocational programs, all of which at least theoretically benefit the prisoners (and any of which disabled prisoners could be excluded from participation in.)" *Id*. at 210 (internal citations omitted).

Some of the general prohibitions against discrimination contained in the Code of Federal Regulations that may be applicable to Plaintiff's facts include the following:

(b)(1)  A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability--

---

[5]Americans with Disabilities Act of 1990, § 1, *et seq*, as amended, 42 U.S.C. §12101, *et seq*. (Title I), § 2132, *et seq*. (Title II), §12181, *et seq*. (Title III).

**ORDER  7**

> (i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;
>
> (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;
>
> (iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;
>
> (iv) Provide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others;
>
> (7) A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.
>
> (8) A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.
>
> (d) public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.

28 C.F.R. § 35.130(b) & (d).

**C. Discussion**

**ORDER 8**

Here, Plaintiff asserts that his mental illness renders him a qualified individual with a disability.  He also alleges that he was excluded from participation in the TC rehabilitative program by virtue of his disability, that he was not provided with an alternative for similar rehabilitative therapy, and that he was denied an opportunity for parole as a result of being excluded from the TC program, a prerequisite to parole.  *See* 28 C.F.R. § 35.130(b)(7).

Applying the standard for a preliminary injunction to the facts of this case, the Court finds and concludes that Plaintiff has not established that he is in danger of immediate serious or irreparable harm.  He is in no danger of being moved into a TC housing unit that is allegedly unsuitable for inmates with PSTD and bipolar personality disorder because he has been exempted from the program.[6]  Failure to be *released* on parole is not an issue that can be addressed in a civil rights case, only whether Plaintiff has been granted parole consideration with conditions appropriate to his alleged disability.[7]  The Court does not consider the issue of whether Plaintiff is considered for

---

[6]  Further, there is insufficient evidence in the record to show that this particular issue has arisen again since Plaintiff was removed from the TC program.  There is no data in the record to support Plaintiff's generalization that any inmate who has PTSD and bipolar disorder would be harmed if placed in the TC program.  Further, the screening procedure appears adequate to address this issue to the degree that the Court concludes that inmates with PTSD and bipoloar disorder are not currently in danger of suffering irreparable harm regarding placement in the TC program.  For purposes of the request for preliminary injunction only, and not for purposes of determining the ultimate merits of Plaintiff's case, Plaintiff has not shown that he is in danger of irreparable harm.

[7]  In *Wilkinson v. Dotson*, 544 U.S. 74 (2005), the Court determined that an inmate may initiate a § 1983 action to seek invalidation of "state procedures used to deny parole eligibility . . . and parole suitability," but he may not seek "an injunction ordering his immediate or speedier

**ORDER  9**

parole during the course of this action an issue that would lead to a showing irreparable

harm.  The United States District Court for the District of Columbia clearly explained this

necessary element as follows:

> Irreparable harm is an imminent injury that is both great and certain,
> and that legal remedies cannot repair.
> The key word in this consideration is irreparable. Mere injuries,
> however substantial, in terms of money, time and energy necessarily
> expended in the absence of a stay, are not enough. The possibility that
> adequate compensatory or other corrective relief will be available at a later
> date, in the ordinary course of litigation, weighs heavily against a claim of
> irreparable harm.

*Bors v. Allen*, 607 F.Supp.2d 204, 210 (D.D.C. April 14, 2009) (internal citation omitted).

Because Plaintiff is not in a position where he might suffer an irreparable

permanent injury, the Court concludes that the overall  issue of whether the IDOC and

ICC currently have or should be required to create an alternative program for mentally ill

persons so that the mentally ill persons can obtain the same rehabilitative benefits of the

TC program described by Olivia Craven is the type of issue involving "difficult questions

of law" and "disputed questions of fact" that need not be decided at the preliminary

injunction stage.  *See Internat'l. Molders' and Allied Workers' Local Union No. 164 v.

Nelson*, 799 F.2d at 551; *see* Brian Lester, *The Americans with Disabilities Act and the

Exclusion of Inmates from Services in Prisons: A Proposed Analytical Approach

Regarding the Appropriate Level of Judicial Scrutiny of a Prisoner's ADA Claim*, 79

---

release into the community."  544 U.S. at 82. At most, an inmate can seek as a remedy
"consideration of a new parole application" or "a new parole hearing," which may or may not
result in an actual grant of parole. *Id*.

**ORDER  10**

N.D. L. Rev. 83 (2003).[8]  Because Plaintiff is not currently in the TC program and he has

---

[8]  The introduction to this article poses the following issues:

The Supreme Court in *Pennsylvania Department of Corrections v. Yeskey* resolved a division among the circuits regarding the applicability of the Americans With Disabilities Act (ADA) to state prisons. In *Yeskey*, the Supreme Court held that the ADA applies to state prisons, yet the Court left some important issues unresolved, including the appropriate level of scrutiny a court should apply in deciding whether a disabled inmate has been excluded from a prison's services, programs, or activities in violation of the ADA. The ADA's application to prisons can fall into three general categories: (1) the prison's policies and procedures, (2) architectural barriers inmates confront, and (3) an inmate's ability to communicate. When a court analyzes an inmate's claim under any of these categories, ample room for disagreement regarding the appropriate level of review  arises from the deference courts have traditionally afforded to prison regulations and policies.

*Yeskey*, and the controversy it has generated over the ADA's application to state prisons, seemed in many ways destined to collide with an earlier Supreme Court decision, *Turner v. Safley*, [482 U.S. 78 (1987)].  In *Turner*, the Court applied a deferential standard of review to a prison policy that an inmate alleged infringed on his right to free speech under the First Amendment. The *Turner* doctrine, under which a prison regulation challenged on the grounds of a constitutional right violation will be upheld so long as it is reasonably related to a legitimate penalogical interest, emerged from this decision.  How the *Turner* doctrine applies to prisoners' statutory rights has not been clear. Nevertheless, the *Yeskey* and *Turner* issues have converged. While some incorporation of the *Turner* doctrine into the ADA appears inevitable, its precise form and the weight assigned to prison policies are far from certain. Subsequent courts have either fully adopted the rationally related to legitimate penalogical interests approach or have adopted it in a modified form, generally by rejecting full incorporation of *Turner* or including the *Turner* principles within some part of the ADA analysis.

Resolution of this issue will have far reaching consequences, and courts should avoid approaches that favor either extreme. The ease with which a prison can justify its regulation under the *Turner* doctrine threatens to eviscerate the applicability of the ADA from prisons altogether, manifesting a complete departure from the Supreme Court's decision in *Yeskey*. On the other hand, incorporating the *Turner* principles within the existing ADA analytical framework without some methodological process to account for the security concerns of prisons could create outcomes that unduly interfere with prison policies.

**ORDER  11**

been exempted from attending it, a preliminary injunction is not necessary here to

"preserve the status quo . . . until the merits of the action are ultimately determined." *See*

*University of Texas v. Camenisch*, 451 U.S. at 395.

Because Plaintiff is currently protected from the harm he fears and because the

merits of the case present a novel issue that will require the balancing of the interests of

mentally ill prisoners and the interests of society both in rehabilitation and cost, the Court

also concludes that Plaintiff has not shown that the balance of potential harm favors him,

that the public interest favors granting the relief he seeks, or that the balance of hardships

tips sharply in his favor.   Based upon the foregoing, the Court concludes that Plaintiff is

not entitled to a preliminary injunction because he has failed to meet his burden of proof

to show that the facts and law clearly favor him.

## MOTION FOR PRETRIAL CONFERENCE

All Defendants have filed their Answers.  Plaintiff requests a conference to argue

the pending motion, discuss settlement, and set a pretrial schedule.  Plaintiff's Motion for

a Pretrial Conference shall be denied as unnecessary at this time.  The Court shall issue a

pretrial schedule in this Order.  The parties are ordered to follow the pretrial schedule

unless a later order supersedes it.

## ORDER

---

79 N.D. L. Rev at 83-85.

**ORDER  12**

Based on the foregoing, IT IS HEREBY ORDERED that Plaintiff's Motion for a Temporary or Preliminary Injunction (Docket No. 14) is DENIED.

IT IS FURTHER HEREBY ORDERED that Plaintiff's Motion for a Pretrial Conference (Docket No. 19) is DENIED.

IT IS FURTHER HEREBY ORDERED that the following pre-trial schedule shall govern this case:

1. **Disclosure of Relevant Information and Documents:** Within **30 days** of entry of this Order, the parties shall provide each other with relevant information pertaining to the claims and defenses in this case, including the names of individuals likely to have discoverable information, along with the subject of the information, as well as any relevant documents in their possession, in a redacted form if necessary for security or privilege purposes; and, if necessary, they shall provide a security/privilege log sufficiently describing any undisclosed relevant documents which are alleged to be subject to nondisclosure.  Any party may request that the Court conduct an in camera review of withheld documents or information.

2. **Completion of Discovery and Requests for Subpoenas:**  All discovery shall be completed within **150 days** after entry of this Order.  Discovery requests must be made far enough in advance to allow *completion* of the discovery in accordance with the applicable federal rules *prior* to this discovery cut-off date.  Discovery is exchanged between parties, not filed

ORDER  13

with the Court.  The Court is not involved in discovery unless the parties

are unable to work out their differences between themselves as to whether

the discovery responses are appropriate.  In addition, all requests for

subpoenas duces tecum (production of documents by nonparties) must be

made within **120** days after entry of this Order.  No requests for subpoenas

duces tecum will be entertained after that date.  To obtain a subpoena,

Plaintiff must first submit to the Court the names, addresses, and the type of

information sought from each person or entity to be subpoenaed, and

Plaintiff must explain the relevance of the items requested to his claims.

The Court will then determine whether the subpoenas should issue.

3.      **Depositions**:   Depositions, if any, shall be completed within **150 days** after

entry of this Order**.**  If Defendants wish to take the deposition of Plaintiff or

other witnesses who are incarcerated, leave to do so is hereby granted.  Any

such depositions shall be preceded by ten (10) days' written notice to all

parties and deponents.  The parties and counsel shall be professional and

courteous to one another during the depositions.  The court reporter, who is

not a representative of Defendants, will be present to record all of the words

spoken by Plaintiff (or other deponent), counsel, and any other persons at

the deposition.  If Plaintiff (or another deponent) wishes to ensure that the

court reporter did not make mistakes in transcribing the deposition into a

written form, then he can request the opportunity to read and sign the

**ORDER  14**

deposition, noting any discrepancies between what is transcribed and what he believes he said.  If Plaintiff wishes to take depositions, he must file a motion requesting permission to do so, specifically showing his ability to comply with the applicable Federal Rules of Civil Procedure by providing the names of the proposed persons to be deposed, the name and address of the court reporter who will take the deposition, the estimated cost for the court reporter's time and the recording, and the source of funds for payment of the cost.

4. **Dispositive Motions:**  All motions for summary judgment and other potentially dispositive motions shall be filed with accompanying briefs within **180** days after entry of this Order.  Responsive briefs to such motions shall be filed within thirty (30) days after service of motions. Reply briefs, if any, shall be filed within fourteen (14) days after service of responses.  All motions, responses, and replies shall conform to Rule 7.1 of the Local Rules for the District of Idaho.  **Neither party shall file supplemental responses, replies, affidavits, or other filings not authorized by the Local Rules without prior leave of Court.  No motion or memorandum, typed or handwritten, shall exceed 20 pages in length.**

5. **Alternative Dispute Resolution**:  Should the parties (meaning Plaintiff and at least one set of Defendants) decide they wish to pursue a settlement

**ORDER  15**

conference, they shall file a joint stipulation, specifying the month and year they would like to hold the settlement conference.  The Court will not entertain a request for a settlement conference made by only one party.

DATED:  **August 28, 2009**

Honorable B. Lynn Winmill
Chief U. S. District Judge

**ORDER  16**